[No. G041316. Fourth Dist., Div. Three. Apr. 8, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM MICHAEL PEARL, Defendant and Appellant.

COUNSEL

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda Cartwright-Ladendorf and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FYBEL, J.—**

INTRODUCTION

William Michael Pearl challenges his conviction for one count each of first degree burglary (Pen. Code, § 459 [count 1]) and receiving stolen property (Pen. Code, § 496, subd. (a) [count 2]) on the ground the trial court erred by denying his motion to suppress evidence seized during warrantless searches of his living space. The only justification ever offered by the prosecution for the warrantless searches was that Pearl was on parole and subject to a search condition when the searches were conducted.

We hold the prosecution failed to meet its burden imposed by California law and the Fourth Amendment to the United States Constitution of establishing at the suppression hearing that Pearl was on parole when the warrantless searches were conducted. Penal Code section 3000, subdivision (b)(5) sets a maximum four-year period of parole, extended only by time in which the parolee was a fugitive from justice under Penal Code section 3064. The

evidence presented at the suppression hearing established Pearl was released from confinement and placed on parole on December 12, 2000. As a result, his parole expiration date, at the latest, would be December 11, 2004, unless it were shown he had ever been a fugitive from justice during his parole term. The warrantless searches were conducted on December 13, 14, and 28, 2004.

The evidence at the suppression hearing was insufficient to prove Pearl was ever a fugitive from justice under Penal Code section 3064 during his four years of parole. At the conclusion of the suppression hearing, the prosecution reopened its case to introduce a certified copy of Pearl's prison record maintained by California's Department of Corrections and Rehabilitation (CDC) pursuant to Penal Code section 969b. Pearl's CDC record contains several handwritten and stamped entries. However, the prosecution presented no witnesses to explain the meaning of any of the entries on the CDC record. Whatever we might surmise the CDC record means, our surmise is not a substitute for testimony under oath subject to cross-examination.

As a consequence, the trial court erred by finding the prosecution met its burden of establishing the warrantless searches were justified as valid parole searches. The warrantless searches therefore violated Pearl's rights under the Fourth Amendment to the United States Constitution.

In the trial court, the prosecution did not invoke, argue, or present any evidence to support the good faith exception to the exclusionary rule, even after the court raised the exception and asked whether the prosecution was asserting it. The trial court denied Pearl's motion to suppress evidence only on the ground the prosecution met its burden of proving Pearl was on parole. In this appeal, the Attorney General has not argued the good faith exception applies.

In *People v. Willis* (2002) 28 Cal.4th 22 [120 Cal.Rptr.2d 105, 46 P.3d 898], the California Supreme Court squarely placed the burden on the prosecution of proving the good faith exception. Recently, in *Herring v. United States* (2009) 555 U.S. ___ [172 L.Ed.2d 496, 129 S.Ct. 695] (*Herring*), the United States Supreme Court further defined the good faith exception, but did not alter the prosecution's burden of proof in the trial court.

We therefore conclude the trial court erred by denying Pearl's motion to suppress evidence.[1] The evidence obtained in the unlawful searches was the only basis of Pearl's conviction for receiving stolen property. The Attorney

[1] Pearl's trial counsel did not cite or argue Penal Code section 3000, subdivision (b)(5) in the motion to suppress or at the suppression hearing. The Attorney General does not assert waiver. We find no waiver because interpretation of section 3000, subdivision (b)(5) is a pure legal issue. (See *Barnes v. Department of Corrections* (1999) 74 Cal.App.4th 126, 130 [87

General does not respond to Pearl's argument the erroneously admitted evidence tainted the conviction for burglary. Accordingly, we must reverse.

## THE SUPPRESSION HEARING

An information charged Pearl with burglary (Pen. Code, § 459 [count 1]) based on an incident on December 13, 2004, and with receiving stolen property (Pen. Code, § 496, subd. (a) [count 2]) based on the property recovered in the searches on December 13, 14, and 28, 2004.

Pursuant to Penal Code section 1538.5, Pearl moved to suppress evidence obtained during the warrantless searches conducted on December 13, 14, and 28, 2004. The prosecution justified the searches on the ground Pearl was on parole at the time and subject to a search condition.

The trial court conducted a suppression hearing at which Palm Springs Police Sergeant Donald Crager, Palm Springs Police Detective William Judd, and Pearl testified.

Crager testified he worked as a detective sergeant in the crimes against property unit of the Palm Springs Police Department. On December 13, 2004, he reviewed a report of Pearl's arrest. Crager knew Pearl from previous arrests and knew he recently had been released from prison. After reading the arrest report, Crager contacted the parole department. When asked how he knew Pearl was on parole, Crager answered: "I know that he was recently released from prison. I reviewed his criminal record, and I contacted the parole department." Crager did not identify the person with whom he spoke at the parole department or what that person said.

Crager went to Pearl's listed address to conduct a search. Judy Spira was at home, and Crager asked her permission to search Pearl's room. She consented, and led Crager to Pearl's room. There, Crager found a laptop computer, later identified as stolen.

Accompanied by Pearl's parole agent and Judd, Crager returned to Pearl's room on December 14, 2004, to conduct a second search. After receiving Spira's permission, Crager searched the residence and the garage. In the garage, Crager found guitars, golf clubs, appliances, tools, watches, animation cells, bicycles, and a tapestry.

Judd testified he accompanied Crager on the December 14 search after speaking with Pearl's parole agent. Judd conducted the third search on

Cal.Rptr.2d 594] ["Assuming appellant failed to raise the issue below, the issue before this court is one of statutory interpretation, which is a pure question of law."].)

December 28, 2004. Chris Strickland, who had moved into Pearl's room, was at the residence and granted Judd permission to search the room. In the room, Judd found cartoon watches and foreign coins belonging to Frank Gambale.

Pearl testified his parole term started on December 12, 2000, the date on which he was released from custody. His initial parole term was three years, but was later increased to four years due to a parole violation. He was never told his parole term extended beyond four years.

After Pearl testified, the court asked Pearl's counsel and the prosecutor if either had additional evidence to offer. Both said no.

During the course of argument, the trial court stated the evidence appeared to show that Pearl's parole expired the day before the first warrantless search. Only then did the prosecutor mention Pearl's CDC record (referred to as the "969b packet"). The court suggested the prosecution reopen to introduce the CDC record. The prosecutor replied, "I can . . . ask to reopen if the Court requires it, I can bring in Parole Agent Abril and Parole Agent Sanchez, but it's just a [Penal Code section] 1538.5 motion. Usually it's not required to bring all the witnesses. Because what's import[ant] is what's in the mind of the searching officers, what their belief is."

In response to the prosecutor's comment, the court asked the prosecutor, "if the officer mistakenly believed that the defendant was on parole, that doesn't make it a legal search, does it? [¶] . . . [¶] . . . We're not talking about good faith reliance on [a] search warrant, are we?" The prosecutor replied, "I would ask to do some research into that. That pops in[to] my mind, good faith exception but we don't have to go that far."

The trial court stated it was important to determine whether Pearl was on parole when the warrantless searches were conducted and suggested the prosecutor present additional evidence on that issue. The prosecutor asserted Crager's testimony was sufficient, but offered to have a parole agent testify "[i]f the Court requires." The court responded, "I am not going to tell you what evidence you need [to] present. You've got some documentary evidence that may in fact solve the question. I don't know but it does seem to me there's a significant issue here. I think we ought to . . . try to resolve that with something a little bit more than the sergeant talked to the parole agent and maybe the parole agent was mistaken and maybe there's some reports that would confirm that one way or another." Pearl's counsel added, "I think we need testimony to clarify this, [Y]our Honor."

At that point, the prosecutor reopened and introduced a certified copy of Pearl's CDC record pursuant to Penal Code section 969b. The trial court

received the CDC record in evidence as exhibit 1. Pearl's counsel did not object to receiving the CDC record in evidence as an authenticated record, but objected to relying on its contents as correct.

The CDC record included notations regarding parole revocations and a running tally of time added to the period of parole. For September 29, 2004, the notation "MCDD 3-2-05" appears (MCDD apparently means modified custody discharge date). The prosecution did not specifically refer to any entries in Pearl's CDC record and produced no witnesses to explain them.

At the end of the hearing, the trial court denied Pearl's suppression motion, concluding the prosecution had met its burden of establishing the searches were valid parole searches. The court did not state any reasons for so concluding or identify any entries in the CDC record it relied on.

### TRIAL AND SENTENCE

The matter was tried to a jury following the trial court's denial of Pearl's suppression motion. The jury found Pearl guilty on both counts, found true the allegation that a person other than an accomplice was present in the residence at the time of the burglary (Pen. Code, § 667.5, subd. (c)(21)), and found true the allegation that Pearl had suffered three prison priors (*id.*, § 667.5, subd. (b)) and eight prior strike convictions (*id.*, §§ 667, subds. (c), (e)(2)(A), 1170.12, subd. (c)(2)). The trial court sentenced Pearl to a total of 48 years to life in prison, with a concurrent term of 25 years to life.

### DISCUSSION

In reviewing the denial of a suppression motion, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence." (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].) "In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*Ibid.*)

### I.

*The Prosecution Failed to Meet Its Burden of Proving Pearl Was on Parole When the Warrantless Searches Were Conducted*

■ The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. " '[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is

directed.' " (*Payton v. New York* (1980) 445 U.S. 573, 585 [63 L.Ed.2d 639, 100 S.Ct. 1371].) Warrantless searches and seizures inside a home are presumed to be unreasonable, and the prosecution bears the burden of showing an exception to the warrant requirement made the search lawful. (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 749 [80 L.Ed.2d 732, 104 S.Ct. 2091]; *Vale v. Louisiana* (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 90 S.Ct. 1969].)

■ "A law enforcement officer who is aware that a suspect is on parole and subject to a search condition may act reasonably in conducting a parole search even in the absence of a particularized suspicion of criminal activity, and such a search does not violate any expectation of privacy of the parolee." (*People v. Sanders* (2003) 31 Cal.4th 318, 333 [2 Cal.Rptr.3d 630, 73 P.3d 496].) A parole search is lawful, even in the absence of a particularized suspicion the parolee has violated the law, so long as the search is not arbitrary, capricious, or conducted for the purpose of harassment. (*People v. Reyes* (1998) 19 Cal.4th 743, 753–754 [80 Cal.Rptr.2d 734, 968 P.2d 445].)

### A. Interpretation and Application of Penal Code Sections 3000, Subdivision (b)(5) and 3064

The only justification offered for the warrantless search of Pearl's room on December 13, 2004, was that he was on parole and subject to a search condition on that date. Pearl argues the search on December 13 was unlawful because his period of parole had ended on December 11, 2004, and the unlawful search on December 13 tainted the searches on December 14 and 28. The Attorney General argues all three searches were lawful parole searches because, due to parole revocations and suspensions, Pearl's period of parole ended on March 2, 2005, the MCDD reflected in Pearl's prison record.

■ To determine whether Pearl was still on parole on December 13, 2004, we first interpret and apply Penal Code section 3000, subdivision (b)(5). We review issues of statutory interpretation de novo. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54] (*Kavanaugh*).) The fundamental task of statutory construction is to ascertain the Legislature's intent in order to effectuate the statute's purpose. (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218].) First, we consider the statutory language and give the statute's words their usual and ordinary meaning. (*Ibid.*) The statutory language must be construed in the context of the statute as a whole and the overall statutory scheme, giving significance to every word, phrase, sentence, and part of an act. (*Ibid.*) If the statutory language is unambiguous, the plain meaning controls and consideration of extrinsic sources to determine the Legislature's intent is unnecessary.

(*Kavanaugh, supra,* 29 Cal.4th at p. 919.) If the statutory language is ambiguous, we may consider other evidence of the Legislature's intent. (*Smith v. Superior Court, supra,* 39 Cal.4th at p. 83.)

The relevant portion of Penal Code section 3000, subdivision (b)(5) reads: "Upon successful completion of parole, or at the end of the maximum statutory period of parole specified for the inmate under paragraph (1), (2), or (3), as the case may be, whichever is earlier, the inmate shall be discharged from custody. The date of the maximum statutory period of parole under this subdivision . . . shall be computed from the date of initial parole and shall be a period chronologically determined. Time during which parole is suspended because the prisoner has absconded or has been returned to custody as a parole violator shall not be credited toward any period of parole unless the prisoner is found not guilty of the parole violation. However, the period of parole is subject to the following: [¶] (A) Except as provided in Section 3064, in no case may a prisoner subject to three years on parole be retained under parole supervision or in custody for a period longer than four years from the date of his or her initial parole."

Penal Code section 3064 reads: "From and after the suspension or revocation of the parole of any prisoner and until his return to custody he is an escapee and fugitive from justice and no part of the time during which he is an escapee and fugitive from justice shall be part of his term."

■ Under Penal Code section 3000, subdivision (b)(5), the date of the maximum statutory period of parole is computed chronologically from the date of initial parole. Pearl's initial parole date was December 12, 2000. Pearl was given the standard parole term for burglary of three years (Pen. Code, § 3000, subd. (b)(1)), later extended by one year (*id.,* § 3057, subd. (a)) for a total of four years—the statutory maximum pursuant to section 3000, subdivision (b)(5)(A). Pearl argues that, under the plain language of section 3000, subdivision (b)(5), the maximum term of parole and custody for parole revocations is four years, and, consequently, his period of parole ended on December 11, 2004, two days before the first search.

The Attorney General argues the four-year maximum under Penal Code section 3000, subdivision (b)(5) does not include any time during which parole was suspended while Pearl was in custody for parole revocations. In other words, the Attorney General contends, if a parolee has a three-year parole period and spends two years in confinement during that period for parole revocations, the parole period will end five years from the date of initial parole, notwithstanding the four-year maximum. The Attorney General argues Pearl's parole term was extended due to suspensions until March 2, 2005, the MCDD reflected in the prison record.

The Attorney General's interpretation ignores subpart (A) of Penal Code section 3000, subdivision (b)(5). Section 3000, subdivision (b)(5) provides, "[t]ime during which parole is suspended because the prisoner has absconded or has been returned to custody as a parole violator shall not be credited toward any period of parole unless the prisoner is found not guilty of the parole violation." This means the term of parole is suspended for the period of time when the parolee has absconded or is held in confinement for a parole violation. Section 3000, subdivision (b)(5) then states: "However, the period of parole is subject to the following: [¶] (A) Except as provided in Section 3064, *in no case* may a prisoner subject to three years on parole be retained under parole supervision *or in custody* for a period longer than four years from the date of his or her initial parole." (Italics added.)

The phrase "in no case" is quite unambiguous: It means there are no exceptions to the four-year maximum—ever—except as provided in Penal Code section 3064. The term "in custody" in Penal Code section 3000, subdivision (b)(5) must mean "confinement" because a parolee is always deemed to be "in custody" until the expiration of the parole period. (*People v. Reed* (1993) 17 Cal.App.4th 302, 307 [21 Cal.Rptr.2d 425]; *People v. Britton* (1984) 156 Cal.App.3d 689, 695 [202 Cal.Rptr. 882].) If "in custody" meant "on parole," the term "parole supervision" would be surplusage. "[W]e must avoid interpretations of statutes that render their terms meaningless." (*Estate of Clementi* (2008) 166 Cal.App.4th 375, 381 [82 Cal.Rptr.3d 685].) Construing "custody" to mean "confinement" is consistent with the use of "custody" in the phrase "returned to custody as a parole violator" earlier in section 3000, subdivision (b)(5).

The plain meaning of Penal Code section 3000, subdivision (b)(5) and subpart (A) is that, in no case, with the only exception being under Penal Code section 3064, may a parolee subject to a parole term of three years remain on parole or in confinement for a parole revocation for more than four years from the initial date of parole.

Penal Code section 3064 excludes from the term of parole the time "[f]rom and after the suspension or revocation of the parole of any prisoner and until his return to custody." During that period, the parolee is deemed "an escapee and fugitive from justice and no part of the time during which he is an escapee and fugitive from justice shall be part of his term." (Pen. Code, § 3064.) Thus, under Penal Code section 3000, subdivision (b)(5), the parole term may not, in any case, exceed four years plus the amount of time the parolee had been a fugitive from justice, regardless of how much time the parolee spends in confinement for parole revocations.

This interpretation of Penal Code section 3000, subdivision (b)(5) is consistent with Penal Code section 3057. Subdivision (a) of section 3057

states, "[c]onfinement pursuant to a revocation of parole in the absence of a new conviction and commitment to prison under other provisions of law, shall not exceed 12 months, except as provided in subdivision (c)." Subdivision (b) of section 3057 states: "Upon completion of confinement pursuant to parole revocation without a new commitment to prison, the inmate shall be released on parole for a period which shall not extend beyond that portion of the maximum statutory period of parole specified by Section 3000 which was unexpired at the time of each revocation."

The Continuing Education of the Bar guide on criminal law procedure and practice reaches the same conclusion. It states: "Time spent in custody on a parole violation does not count against the maximum period of parole. Instead it extends the parole period. However, if the prescribed period for a prisoner is 3 years, he or she may not be retained on parole supervision or in custody on a parole violation for more than 4 years." (Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2008) § 47.7, pp. 1508–1509.)

Pearl was released from custody on December 12, 2000, and his period of parole began that day. Pearl was released from confinement for a parole violation on November 16, 2004. Under Penal Code section 3057, subdivision (b), his parole could not extend beyond the unexpired portion of the statutory maximum of four years specified by Penal Code section 3000, subdivision (b)(5). The four-year statutory maximum ended on December 11, 2004—two days before the warrantless search on December 13, 2004.

### B. *Whether Pearl Had Been a Fugitive from Justice Under Penal Code Section 3064—the CDC Record*

After Pearl testified at the suppression hearing, the trial court suggested the prosecution had not met its burden of proving a valid parole search. Only then did the prosecution introduce Pearl's CDC record. Pearl's counsel did not object to admitting the record into evidence, but did object to treating as factually true the entries contained in the record. The prosecution presented no witnesses to explain Pearl's CDC record.

The CDC record reflected several parole violations and the CDC internally calculated MCDD of March 2, 2005. The CDC record included several entries indicating parole was effectively suspended several days before Pearl was "return[ed] to prison for further proceedings." These entries include a reference to "NCIC Code 2." However, no explanation of these entries was offered at the suppression hearing, and no witnesses testified to their meaning. By way of example, we note entries dated July 29 and 30, 2002, and April 7 and June 19, 2003, which might show suspensions and later arrests. We also see entries on March 4, 2002, showing "actual time spent in custody

this revocation period 225 days"; on April 20, 2004, showing total time served of this revocation "at max"; and on November 9, 2004, showing actual time "spent in custody for this revocation is 60 days." *None* of these entries was referred to in the suppression hearing or explained by a witness. The record lacks any evidence to explain the meaning of these entries. Guesswork on our part cannot replace evidence. A conviction and a sentence of 48 years to life cannot survive appellate review based on a record of this character.

The prosecution presented no testimony to explain what the entries in Pearl's CDC record mean or to establish the record showed that Pearl had ever been a fugitive from justice within the meaning of Penal Code section 3064. Without testimony from knowledgeable people, we cannot know what the entries mean. And that testimony would have to be subject to cross-examination.

■ Accordingly, the prosecution failed at the suppression hearing to meet its burden of proving Pearl was on parole and subject to a warrantless search when any of the searches were conducted in December 2004. The December 13 search, and the subsequent two searches, therefore violated Pearl's rights under the Fourth Amendment.

## II.

### *The Prosecution Did Not Assert the Good Faith Exception to the Exclusionary Rule, and the Attorney General Does Not Argue the Exception Applies*

■ The exclusionary rule, when applicable, forbids the use at trial of evidence obtained in violation of the Fourth Amendment. (*Arizona v. Evans* (1995) 514 U.S. 1, 10 [131 L.Ed.2d 34, 115 S.Ct. 1185]; *United States v. Leon* (1984) 468 U.S. 897, 906 [82 L.Ed.2d 677, 104 S.Ct. 3405].) Suppression is not an automatic consequence of a Fourth Amendment violation, but depends on whether exclusion of the evidence would effectively advance the exclusionary rule's deterrent purpose. (*Arizona v. Evans, supra,* 514 U.S. at p. 11; *Illinois v. Krull* (1987) 480 U.S. 340, 347, 353 [94 L.Ed.2d 364, 107 S.Ct. 1160]; *United States v. Leon, supra,* 468 U.S. at pp. 906–908.)

Under the good faith exception to the exclusionary rule, evidence will not be suppressed if the police officer had an objectively reasonable belief the search or seizure was constitutionally permissible. (*Arizona v. Evans, supra,* 514 U.S. 1; *United States v. Leon, supra,* 468 U.S. at pp. 906–908.) In *People v. Willis, supra,* 28 Cal.4th 22, the California Supreme Court squarely placed the burden on the prosecution of proving the good faith exception, including the burden of proving an error in recordkeeping that led to the

unlawful search was not the fault of any part of the law enforcement team. Recently, in *Herring, supra,* 555 U.S. ___ [129 S.Ct. 695], the United States Supreme Court further defined the good faith exception, but did not alter the prosecution's burden of proof in the trial court.

The prosecution here neither asserted the good faith exception nor met its burden of proving its applicability. In the trial court, the prosecutor did not invoke or argue any exception to the exclusionary rule. On the day of the suppression hearing, the prosecutor filed written opposition to Pearl's motion to suppress, arguing (1) Pearl was on parole at the time of the search, (2) the parole search validly extended to common areas of the house in which Pearl rented a room, and (3) Spira consented to the searches of her home. After the close of evidence at the suppression hearing, the trial court asked the prosecutor directly, "[w]e're not talking about good faith reliance on [a] search warrant, are we?" The prosecutor replied, "I would ask to do some research into that. That pops in[to] my mind, good faith exception *but we don't have to go that far*." (Italics added.)

The prosecution did not present evidence directed to the good faith exception. Crager never testified to the substance of any conversations with the "parole department." Pearl's parole agent did not testify. The prosecution offered Pearl's CDC record to prove he was in fact on parole on December 13, 2004, not to prove Crager or anyone else reasonably relied on that record in determining Pearl was subject to a parole search.

The Attorney General did not argue an exception to the exclusionary rule in respondent's brief. At oral argument, the deputy attorney general confirmed she was not arguing the good faith exception.

In response to our invitation, Pearl and the Attorney General submitted letter briefs addressing *Herring, supra,* 555 U.S. ___ [129 S.Ct. 695]. In his letter brief on *Herring,* the Attorney General reiterated: "It is respondent's position that the parole search of appellant's residence was lawful because he was on parole when the search was conducted. Appellant's status as a parolee at the time of the search was established by records submitted as part of a Penal Code section 969 packet. The records indicated that appellant's parole discharge date had been delayed until March 2, 2005, due to time he spent in custody for multiple parole violations." After discussing *Herring,* the Attorney General asserted, "[h]ere, the evidence adduced at the suppression hearing did not favor exclusion and appellant showed no culpability on the part of law enforcement to justify exclusion." To the contrary, the evidence, under a correct interpretation of Penal Code section 3000, subdivision (b)(5), did not establish that Pearl was on parole at the time of the searches, and, as we have explained, the prosecution—not Pearl—bore the burden of proving the good faith exception.

## III.

### *Erroneous Admission of the Evidence Obtained by the Unlawful Searches Compels Reversal on Both Counts*

Pearl argues the erroneous admission of the evidence obtained by the unlawful searches was prejudicial and violated his Fourteenth Amendment right to due process by leading the jury to convict him. The Attorney General does not address Pearl's claim of prejudice. We agree with Pearl the admission of the unlawfully obtained evidence was prejudicial to him on both the count for receiving stolen property and the count for burglary.

Because Pearl suffered a constitutional violation, his claim of prejudice is reviewed under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (See *People v. Siripongs* (1988) 45 Cal.3d 548, 567 [247 Cal.Rptr. 729, 754 P.2d 1306].) Can we say beyond a reasonable doubt that admission of the evidence obtained in the unlawful searches did not contribute to the jury verdict? (*Chapman v. California, supra*, 386 U.S. at p. 24.) We cannot. The evidence obtained by the unlawful searches was introduced to prove count 2, for possession of stolen property. The verdict of guilt on that count was based entirely on evidence recovered in the searches and therefore must be reversed.

Pearl argues he suffered prejudice too because the "taint" from erroneously admitted evidence "spilled over to the burglary count by bolstering the minimal evidence that otherwise existed to show appellant's intent to commit theft, and, consequently, violated appellant's constitutional right to a fair trial."

Pearl testified at trial, and we cannot conclude the unlawfully obtained evidence did not contribute to the jury verdict by hurting his credibility on the critical issue of intent. Witnesses testified to seeing Pearl outside of a home under circumstances suggesting he was trying to break in to commit burglary. A window screen had been taken down and Pearl was seen hopping a fence into a neighbor's yard. Pearl testified he was not trying to commit burglary, but had gone over to the house in response to hearing a woman screaming. He testified he had tapped on a window to get someone's attention and the window screen fell off accidentally. In addition, the unlawfully obtained evidence might have led the jury to convict Pearl for burglary based on the items found in the searches rather than for the charged offense.

The burglary conviction therefore must be reversed.

## Disposition

The judgment is reversed.

Bedsworth, Acting P. J., and O'Leary, J., concurred.